UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONTINENTAL CASUALTY COMPANY, et al.,

      Plaintiffs/Counterdefendants,

v.                                CASE NO: 8:09-cv-02036-SDM-AEP

STAFFING CONCEPTS, INC., et al.,

      Defendants/Counterclaimants.

_____/

### DEFENDANTS/COUNTERCLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS/COUNTERDEFENDANTS' MOTION TO COMPEL STAFFING CONCEPTS INTERNATIONAL, INC. TO ANSWER PLAINTIFFS/ COUNTER-DEFENDANTS' JUNE 24, 2010 INTERROGATORIES

      The Defendants/Counterclaimants, by and through their undersigned counsel, and pursuant to Federal Rules of Civil Procedure 26, 33 and 37, and Middle District of Florida Local Rule 3.04, hereby file this memorandum in opposition to Plaintiffs/Counterdefendants' Motion to Compel Staffing Concepts International, Inc. to Answer Plaintiffs/Counterdefendants' June 24, 2010 Interrogatories (D.E. 230, the "Motion"). The Interrogatories served by Plaintiffs greatly exceed the number allowed by Fed.R.Civ.P. 33, seek information not relevant to the claims and defenses in this lawsuit, are overly broad and unduly burdensome, vague and ambiguous, and as such, Defendants request that the Motion should be denied.

### INTRODUCTION AND FACTUAL BACKGROUND

      Plaintiffs/Counterdefendants (hereinafter collectively referred to as "CNA") have filed a breach of contract action against Defendants/Counterplaintiffs (hereinafter collectively referred to as "SCI"). CNA's three-count Complaint seeks in excess of $13 million in damages from SCI

based upon insurance policies issued from 2000 to 2003 as well as finance agreements. SCI's deductibles under the 2000 through 2003 policies ranged from $250,000.00 to $750,000.00 per claim. These policies create a self-insured situation for most claims. As part of the "insurance program" each year, SCI also had finance agreements that provided for SCI to reimburse CNA for losses within the deductibles of the policies. Effectively, CNA handles all of the administration of each claim made under each policy, including monitoring the claim made by an employee, conducting an initial and ongoing investigation as to the claim, monitoring and approving medical treatment, making payments to medical providers, and making indemnity (wage) and disability payments to the injured employees. In short, the alleged deductible charges for which CNA seeks damages are driven entirely by the losses reportedly incurred in paying medical and indemnity benefits to workers compensation claimants. Under the insurance policies at issue in this case, the medical payments, disability payments, and other costs associated with each claim, while initially paid by CNA, are then passed on to SCI up to the deductible limits. CNA bears no cost and hence no loss unless payments on a claim exceed the deductible amount. The backup documentation or information underlying the amounts summarized in the invoices from CNA for which it seeks damages are contained in the workers compensation claims files which are solely in CNA's possession, and which CNA has refused to produce in this case.

SCI refused to pay the deductible charges and denied these charges as due in this lawsuit because SCI does not believe the underlying workers compensation benefits and amounts paid by CNA were properly incurred, in accordance with the parties' contracts and governing state workers compensation laws. SCI refused to pay the deductible charges after discovering that CNA exited a large segment of the workers compensation market, leaving SCI and other PEOs stranded with

CNA's "runoff" claims handling units. The "runoff" units are where CNA elected to staff workers compensation claims with untrained personnel and temporary employees, to reduce CNA's overhead on accounts that were high-deductible based, with no chance of policy renewal. Essentially, without the motive to properly manage the losses incurred on the workers compensation claims, the charges to SCI in a high-deductible policy began an unprecedented escalation. SCI denies that it owes CNA the amounts claimed.

The only manner in which CNA's handling of the claims can be assessed against the applicable contractual and statutory obligations imposed on CNA is to review the complete workers compensation claims files handled by CNA. However, CNA has refused to produce the workers compensation files at issue in this case. (CNA's refusal to produce those claim files is the subject of SCI's pending Motion to Compel.) Instead, CNA relies solely upon invoices which do not provide any explanation or breakdown of the line-item charges. In this case, the invoices are nothing more than a summary. The invoices provide a basic summary reflecting the name of the injured employee, the type of injury, the total amounts paid on that claim, and the amount of the reserves for that claim. Without the backup documentation that resides in the workers compensation claims files, the Defendants cannot determine the veracity of the line-item entries on the invoices showing only a total amount.

On June 24, 2010, Plaintiffs served SCI with Interrogatories. A copy of these Interrogatories is attached hereto as Exhibit "A". In response, SCI timely served its Consolidated Objections based on a number of reasons. A copy of SCI's Consolidated Objections is attached hereto as Exhibit "B". Plaintiffs have now filed a motion to compel Staffing Concepts International, Inc. to answer the Interrogatories.

Despite their failure to participate in discovery and their refusal to produce the workers compensation claim files which contain the backup documentation for the amounts reflected on the invoices, CNA served SCI with an excessive number of interrogatories that seek, in large part, information regarding amounts reflected in 70 invoices[1] contained in a summary or matrix of the invoices prepared by CNA which is attached to the Interrogatories as Exhibit "1". While CNA has enumerated only 13 interrogatories, each of those 13 interrogatories consists of numerous unrelated subparts, each of which is a separate interrogatory. In addition, each invoice listed on the invoice "matrix" must be considered a separate interrogatory and thus, the total number of interrogatories that CNA demands SCI answer exceeds 660.[2]

## MEMORANDUM OF LAW

CNA's Motion to Compel Staffing Concepts International, Inc. to Answer the Interrogatories should be denied based on one or more of the following reasons: CNA's Interrogatories exorbitantly exceed the number allowed by Fed.R.Civ.P. 33, seek information not relevant to the claims and defenses in this lawsuit, are overly broad and unduly burdensome, vague and ambiguous.

**I.   SCI Properly Objected to CNA's Interrogatories**

In objecting to CNA's Interrogatories due to their excessive number, SCI chose to object

---

1 After SCI filed its objections, CNA stated in its Motion to Compel that the 22 page spreadsheet attached to the Interrogatories as Exhibit "1" contains 70 invoices listed in various formats, initially in summary form and then by policy year. However, while SCI agrees that the "overall summary" section of the exhibit only lists approximately 70 invoices, one of the 70 invoices listed, Invoice # 302198 which appears to be for premium charges related to multiple insurance policies, is summarized at the last five pages of Exhibit "1" and contains hundreds of entries. For purposes of this response only, SCI will use CNA's number of 70 invoices as the number listed on the matrix or summary attached as Exhibit "1." However it should be noted that while CNA demands information relating to 70 invoices it has failed to produce all 70 invoices to SCI.

2 Over a month after serving its June 24, 2010 Interrogatories, CNA produced documents bearing Bates Nos. CCC060143-060186 which include a revised summary of invoices and new claims for damages, some of which duplicate amounts that CNA has demanded in the pending arbitration where CNA claims SCI has its exclusive remedy.

to all interrogatories rather than selectively answering some of them to reach the 25 allowed under

Fed.R.Civ.P. 33.  In *Allahverdi v. Regents of the University of New Mexico*, 228 F.R.D. 696

(D.N.M. 2005), a plaintiff propounded interrogatories to which the defendant objected primarily on

the basis that the number of interrogatories exceeded the amount allowed by the Federal Rules of

Civil Procedure, but also provided answers to some of the interrogatories.  The court found that

since the defendants had answered some of the interrogatories and not others, they had waived their

objection based on the interrogatories exceeding the number allowed under Fed.R.Civ.P. 33.  *Id.* at

698. Finding the objection waived, the court additionally held that since the plaintiff had not served

a number of interrogatories that greatly exceeded the permissible number and had made a good

faith effort to comply with the permissible number of interrogatories under Rule 33, the defendant

would be required to answer the interrogatories.   The court set forth the approach to be taken if a

party believes that the number of interrogatories served exceeds twenty-five.  The court held:

> When a party believes that another party has asked too many interrogatories, the
> party to which the discovery has been propounded should object to all
> interrogatories or file a motion for protective order.  The responding party should
> not answer some interrogatories and object to the ones to which it does not want to
> respond. By answering some and not answering others, the Defendant waived this
> objection.

*Id.* at 698.  Contrary to CNA's argument that this holding is *dicta*, courts in other jurisdictions

support and have followed this approach, all specifically citing to *Allahverdi* with approval for the

holding that if there is a numerosity objection and a responding party responds to *any*

interrogatories, that party waives its numerosity objection.  *See Munoz v. Citywide Banks of*

*Colorado*, 2010 WL 2650042 at *2 (D.Colo. 2010) ("the Plaintiff concedes that *Allahverdi* stands

for the proposition that a party waives an objection to an excessive number or discovery requests if

5

the party responds to the challenged discovery requests."); *Barkes v. First Correctional Medical*, 2010 WL 1962797 (D. Del. 2010); *Lewis v. Donley*, 2009 WL 2176123 at *3 (D.Ak. July 22, 2009)("[a] party who selectively responds to some interrogatories may be found to have waived its objection to the number of interrogatories."); *Jaramillo v. Adams County School District*, 2010 WL 1839329 (D. Colo. 2010); *Holmes v. Trustees of Purdue University*, 2008 WL 656263 (N.D. Ind. 2008); and *AAB Joint Venture v. United States*, 75 Fed. Cl. 448, 457 (2007).

Several other federal courts have held that if the responding party wishes to object to the number of interrogatories as excessive, the responding party must object to the court before responding to the interrogatories; otherwise, the objection is waived. *See Herdlein Tech. Inc. v. Century Contractors, Inc.*, 147 F.R.D. 103, 104 (W.D.N.C. 1993). (finding that responding party should have objected to all interrogatories rather than answering only some of the interrogatories; otherwise the responding party could selectively respond to the interrogatories and thereby strategically omit the most prejudicial information); *Meese v. Eaton Mfg. Co.*, 35 F.R.D. 162, 166 (N.D. Ohio 1964) (deeming an objection waived where the party simultaneously objected and answered responsively to an interrogatory); *Lower River Marine, Inc. v. USL-497 Barge, No. 06-04083*, 2007 WL 4590095 (E.D. La. Dec. 21, 2007) (holding that a motion to quash interrogatories was proper where the propounding party served more than 25 interrogatories).

A party objecting to discovery may seek a protective order or provide appropriate written objections and leave it to the party seeking discovery to file a motion to compel. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. (N.D. Ill. 2005); *Nelson v. Capital One Bank*, 206 F.R.D. 499 (N.D. Cal. 2001). SCI correctly objected to all of the excessive interrogatories propounded by CNA.

II.     **CNA's June 24, 2010 Interrogatories Greatly Exceed the Number Permitted By The Federal Rules of Civil Procedure**

Fed.R.Civ.P. 33(a) expressly forbids a party from serving more than 25 interrogatories, including all discrete subparts, without leave of court or written stipulation.   Rule 33(a) was amended to include the numerical limit in 1993. *Walker v. Lakewood Condominium Owners Ass'n*, 186 F.R.D. 584, 586 (C.D. Cal. 1999).  As the district court noted in *Walker*, "[t]he purpose of this revision [was] to reduce the frequency and increase the efficiency of interrogatory practice" since "the device can be costly and may be used as a means of harassment." *Id*; also see Advisory Committee Note to 1993 Amendment to Rule 33.

In its Interrogatories to SCI, CNA has greatly exceeded the permissible number of interrogatories.  For example, Interrogatory No. 4 alone, which references the attached Exhibit "1" spreadsheet or matrix prepared by CNA containing at least 70 invoices, contains at least 9 additional subparts enumerated as 4(a)-(i).  Courts within the jurisdiction of the Eleventh Circuit have recently followed what is known as the "related question test" to determine whether a subpart in an interrogatory should be considered discrete.  Under the related question test, courts assess whether the subparts are "logically or factually subsumed within and necessarily related to the primary question." *Oliver v. City of Orlando*, 2007 WL 3232227, *2 (M.D. Fla. Oct. 31, 2007) (internal citations omitted.)

In Interrogatory No. 4, there is no "primary question" to which the 9 subparts could relate. Rather, it simply states "[f]or each invoice identified on the spreadsheet attached hereto as Exhibit 1 (previously served on you as Exhibit B to CNA's May 5, 2010 Rule 26 Initial Disclosures), state the following." *See*, e.g., *Lewis v. Donley*, 2009 WL 2176123 at *4 (D.Ak. July 22, 2009)(finding

that interrogatory requests were excessive when the interrogatory did not contain a central question to which the subparts could relate).  Thus, CNA's Interrogatory No. 4's nine listed subparts are not related questions and actually constitute 9 interrogatories.  Further, Interrogatory No. 4 expressly demands that SCI state the information in subparts (a)-(i) for each of the 70 invoices listed on the Exhibit 1 matrix.  Thus, as discussed in more detail below, each of the 70 invoices on the matrix constitutes a separate interrogatory.  This means that CNA demands that SCI answer 360 interrogatories for No. 4 alone (9 subparts multiplied by 70 invoices).  Case law supports this "multiplier", which CNA now wrongly asserts is incorrect.[3]

In *Lewis*, the court held that plaintiff's interrogatories requesting information regarding items contained in a matrix attached to the interrogatories were excessive in number and did not require the defendant to answer such interrogatories.  In reaching their conclusion, the *Lewis* court stated that in interrogatory 8, the plaintiff attached a chart of responses and requested information in subparts a-d as to each response listed on the chart.  In interrogatory 9, the plaintiff attached another chart and requested information in subparts a-b as to each response listed on the chart. *Lewis* at *4.  In reviewing the numerosity objection made by the defendant, the court found that the matrix attached to interrogatory 8 contained 40 factual events, while the matrix attached to interrogatory 9 contained approximately 45 factual events.  Thus, the court found that the interrogatories sought to discover the responding party's position regarding nearly 100 independent

---

[3] Although CNA takes the position in its Motion to Compel that such calculation is incorrect, this position is contradictory to its previously filed Objections to SCI's Interrogatories, where CNA makes a similar numerosity objection regarding a chart attached to SCI's Interrogatories as Exhibit "A" listing 250 claims files and uses the same "incorrect multiplier" of which it now complains.  In support of its numerosity objection, CNA states that for SCI's Interrogatory No. 6, the 18 subparts should be multiplied by the 250 claims listed on the Exhibit "A", for a total of 4,250 total interrogatories for No. 6 alone. *See* p. 7 of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel Responses to SCI's April 12, 2010 Interrogatories (D.E. 222).

events listed on the attached matrices. Therefore, the court concluded that since each of the nearly 100 events contained within the matrices attached to interrogatories 8 and 9 sought various and unconnected factual details, they constituted discrete interrogatories. *Id.*

The arrangement of CNA's interrogatories requesting information regarding entries on their attached Exhibit 1 is identical to that of *Lewis*. In this case, CNA is seeking SCI's position regarding at least 70 invoices, each of which has independent factual circumstances as each invoice is separate and distinct from the other. As in *Lewis*, the invoices on CNA's matrix also span a period of six years, from June 4, 2003 to November 10, 2009. Most of the invoices on the summary were issued thirty days apart and each has a separate invoice number. Thus, each of the 70 invoices contained within CNA's Exhibit 1 matrix are unconnected and should be considered a discrete interrogatory. Considering the 70 invoices in conjunction with Interrogatory No. 4's 9 listed subparts, Interrogatory No. 4 alone constitutes 360 interrogatories. Interrogatory No. 5 also seeks information regarding the invoices on Exhibit 1 and contains at least 4 discrete subparts (a)-(d), thus constituting at least 280 interrogatories.

Those are only two of the 13 enumerated Interrogatories served by CNA. In total, it appears that CNA has served over 660 Interrogatories. CNA's interrogatories are grossly excessive in number and are therefore abusive, burdensome and oppressive. The burden and expense of responding to CNA's Interrogatories far outweigh any possible benefit that CNA may derive from them. This Court should sustain SCI's objection that CNA's Interrogatories greatly exceed the number allowed under Fed.R.Civ.P. 33 and not require SCI to answer any of the Interrogatories.

**III.    In Addition to Being Excessive, CNA's Interrogatories Are Variously Overly Broad, Unduly Burdensome, Bear no Relevance to Any of the Claims, Defenses, or Counterclaims, and Are Vague and Ambiguous**

**A.     SCI is not Required to Respond to Interrogatories that are Overly Broad and Unduly Burdensome**

While the sheer number of the interrogatories should be sufficient grounds for this Court to deny CNA's Motion to Compel, responding to the interrogatories as written by CNA imposes an undue burden upon SCI. Interrogatory Nos. 4-13 are overly broad and unduly burdensome. Most of the interrogatories propounded by CNA simply cannot be answered without a detailed analysis of hundreds of claims which would necessitate reviewing thousands of pages of documents. For example, Interrogatories No. 4 and 5 request information relating to the spreadsheet created by CNA that consists of the 22 page summary of CNA's invoices. As admitted by CNA, the 22 page summary includes 70 invoices. Each invoice consists of over 100 pages and reflects charges for hundreds of claims. Thus, while CNA makes it appear in the interrogatories that this is simply a task of reviewing 22 pages to respond to Interrogatories No. 4 and 5 and their thirteen subparts, responding to each of those interrogatories requires SCI to review each of the 70 invoices and review each of the hundreds of claims included in each of the invoices.

Likewise, responding to the Interrogatories that relate to the invoices is an unduly burdensome and oppressive task. As stated above, CNA served 640 interrogatories relating to invoices but has failed to produce all the invoices on which they now demand detailed information. To properly respond to the interrogatories relating to the invoices would in all likelihood take SCI months (if SCI even had access to the underlying claims files which CNA refuses to produce in this case). For example, to answer Interrogatory No. 4 starting with the first invoice on the summary Exhibit "1", Invoice No. CB09331, would require SCI to review the entire invoice. Invoice No. CB09331 consists of **185 pages, and includes charges relating to over 700 separate claims.**

10

(CNA's Interrogatories include similar requests for all 70 invoices, and each of those invoices consists of countless pages – most in excess of 100 pages and reflect over 700 claims.) The invoice that CNA references on Exhibit 1 is merely a summary of what is included in the invoice. Interrogatory No. 4 specifically requests that Defendants state the following with regard to **each** of the 70 invoices on Exhibit "1":

> 4.    For each invoice identified on the spreadsheet attached hereto as Exhibit 1 (previously served on you as Exhibit B to CNA's May 5, 2010 Rule 26 Initial Disclosures), state the following:
>
> a.    Did any of the SCI Companies (or broker or producer providing services to the SCI Companies) receive the invoice?
>
> b.    Did any of the SCI Companies (or broker or producer providing services to the SCI Companies) protest the amount owed on the invoice at or near the time it was received? If yes, specify when and to whom such protest was made.
>
> c.    Did any of the SCI Companies (or anyone acting on their behalf) pay the invoice? If yes, specify when such payment was made and the manner of payment.
>
> d.    With respect to those invoices seeking reimbursement of claim expenditures, do any of the SCI Companies contend that the CNA Insurers did not pay the full amount of the expenditures reflected on the invoice? If so, identify all expenditures reflected on the invoice that the CNA Insurers allegedly did not pay.
>
> e.    With respect to those invoices seeking payment of premiums, do any of the SCI Companies contend that the CNA Insurers miscalculated the premium amounts reflected on the invoice? If so, specify the amount which was incorrectly calculated and set forth the correct amount.
>
> f.    Do any of the SCI Companies contend that the CNA Insurers miscalculated the amounts owed for reconciliations, program conversions, or annual loss bills, as reflected on the invoices seeking those amounts? Is so, specify the amount which was incorrectly calculated and set forth the correct amount.
>
> g.    With respect to those invoices seeking payment of loss fund charges, do any of the SCI Companies contend that the CNA Insurers miscalculated the amounts owed for loss fund charges? If so, specify the amount which was incorrectly calculated and set forth the correct amount.

11

h.    Do any of the SCI Companies contend that the CNA Insurers billed for an amount in excess of the per claim deductible or plan maximum? If so, specify the amount which was incorrectly billed and set forth the correct amount.

i.    Do any of the SCI Companies contend that the CNA Insurers have failed to audit the SCI Companies for payments made? If so, specify the amount which was not properly audited.

Interrogatory No. 5 specifically requests that Defendants state the following with regard to

**each** of the 70 invoices on Exhibit "1":

5.    Excluding information falling within the scope of Instruction A of these Interrogatories, state whether the SCI Companies assert or intend to assert that the invoiced amounts reflected in Exhibit 1 are not due and owing under the Finance Agreements or Policies.

a.    Separately identify each of the amounts which defendants contend are not due and owing under the Finance Agreements or Policies.

b.    For each of the amounts identified in subsection (a), state with specificity all reasons why you believe that the amount is not due and owing under the Finance Agreements or Policies.

c.    Identify all documents which you believe support your answer to subsection (b).

d.    Identify each employee of, consultant for, or agent of the SCI Companies with information concerning the reason identified in subsection (b).

In order to respond to these interrogatories alone, Defendants must analyze each of the over 700 claims included in Invoice CB09331 and the amounts CNA charged for each claimant during the period covered by the invoice. Of course, in order to determine the requested information including but not limited to whether the amount is valid or should have been passed on to SCI under the parties' contracts and applicable workers compensation laws, SCI needs the underlying documents in each claim file, which Plaintiffs have repeatedly refused to produce and are the subject of a separate Motion to Compel filed by Defendants. The unreliability of CNA's invoiced

amounts is already established by CNA's undeniable misconduct in abandoning the PEO market and sending SCI's account to a runoff unit. This misconduct was further demonstrated by CNA when it recently conceded in the pending arbitration that it made mistakes on 5 files selected for review.[4] SCI needs the documents which CNA has refused to produce to determine whether those charges are attributable to: erred or duplicate payments to vendors or claimants, erred payments based on improper calculation of benefits; overcharges; penalties, fines, sanctions, interest, costs, and/or attorneys fees imposed against the carrier by either the state workers compensation division or a judge of compensation claims; penalties, fees, or interest imposed against the carrier by vendors; undue medical or indemnity claims; pre-existing injuries not compensable with workers compensation benefits; billings by CNA's internal nurse case managers in place of adjuster activity; amounts paid that should have been secondary to other benefits to claimants; amounts paid that should have been secondary to other benefits to claimants; amounts paid that were recoverable by subrogation from a third party; invoices submitted for the wrong claimant; charges in excess of the individual and aggregate deductible caps provided by the parties' contracts stated within each Finance Agreement on which CNA sues (see Section 5 of Composite Exhibit 3, SCI's Motion to Compel Documents (D.E. 206); charges subject to on-going retroactive adjustment by Plaintiffs resulting in credits due to SCI; mismanagement of collateral funds deposited with Plaintiff's affiliate, North Rock Insurance Company; and other misconduct in the course of the handling of the

---

4 On August 11-13, 2010, CNA Claim Plus, Inc., CNA's affiliate, and Staffing Concepts International, Inc. participated in an abbreviated Arbitration hearing for the arbitrators to hear evidence of claims mishandling by CNA with respect to five out of the 4,376 claim files at issue. In the course of the arbitration hearing, SCI presented evidence as to a substantial number of mistakes made by CNA in the course of handling those five workers compensation claims. SCI was limited to a small universe of five claim files out of the 4,376 files at issue in this case, but those five claim files are the only ones which CNA has at least partially produced to SCI. These five claims are included within the invoices for which CNA is pursuing damages in this case. Many of the mistakes SCI discovered in the course of reviewing those five claim files are the types of errors and mistakes noted above. In the course of the arbitration hearing, CNA

workers compensation claims by CNA or its affiliates. As noted previously, none of the invoices provide the backup documentation identifying the actual costs or services performed that underlie the amounts paid as reflected in the invoices. The invoices simply provide a basic summary with the name of the injured employee, the type of injury, the total amount paid on the claim (without any indication as to what the payment was for), and the amount of reserves for that claim. SCI must review the underlying documents reflecting the charges incurred. Thus, it could literally take SCI months to properly respond to each of these interrogatories. This is especially unduly burdensome to SCI, when it is CNA's burden in this case to prove its invoices are accurate.

The court may limit discovery "upon the determination that the discovery sought is unreasonably burdensome or expensive or the expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, and the importance of the proposed discovery in resolving the issues." *World Triathlon Corp. v. SRS Sports Centre SDN, BHD,* 2005 U.S. Dist. LEXIS 15412, at *2 (M.D. Fla. July 29, 2005). In *Tate v. U.S. Postal Service,* 2007 WL 521848 (S.D. Fla. Feb. 14, 2007), the plaintiff propounded interrogatories seeking information on postal service positions that defendant filled in Miami-Dade counties. In response, the defendant objected based on the request being overly broad and burdensome. The court sustained defendants' objection because it would have required a time-consuming manual search through thousands of files and documents that were not reasonably necessary in the case. *Id.* at * 5. Further, the court held that even if all of the information was relevant, the burden on the defendant to locate the information within a trove of documents greatly outweighed its relevance. *Id.* As in *Tate,* CNA seeks to impose a tremendous hardship upon SCI

conceded that CNA made mistakes in handling the files, but they disputed the materiality of those mistakes.

14

by propounding 13 excessively broad and burdensome Interrogatories, including Nos. 2, and 4-13. As stated above, the number of interrogatories was limited to 25 in order to reduce the frequency and increase the efficiency of interrogatory practice" since "the device can be costly and may be used as a means of harassment." *Id*; also see Advisory Committee Note to 1993 Amendment to Rule 33. It is clear that CNA's exorbitant number of interrogatories which impose an undue burden on SCI are not designed to save any party time and expense, but rather, are designed to harass and impose undue burden and expense on SCI. CNA knows full well the analysis that is necessary to validate its charges, but has taken calculated efforts in this lawsuit to deprive SCI, and the Court, of the ability to conduct that analysis, in an effort to preserve their self-serving invoices.

Interrogatory Nos. 2, and 4–13 are also overly broad because of the definitions section of the Interrogatories which purports to define "SCI Companies" as follows:

> 1.      The term "SCI Companies" shall refer to any one or more of Staffing Concepts, Inc; Staffing Concepts National, Inc.; Staffing Concepts International, Inc.; SC of Florida II, Inc.; Venture Resources Group, LLC; Alternative Marketing Program, Inc.; Human Capital Services, Inc.; Productive Employer Concepts, Inc.; Human Capital Solutions, Inc.; and Epic Staff Management, Inc; Staffing Concepts International Inc., a Florida corporation; Staffing Concepts International of Florida, Inc.; Staffing Concepts International National, Inc.; Greystone, Inc.; Accountfirst Insurance Services, Inc.; Executive Management Group, Inc.; HHG I, Inc.; PEO Acquisitions, L.L.C.; PEO Management Group, Inc.; Platformone USA, Inc.; Staffing Concepts I, Inc.; Staffing Concepts II, Inc.; Staffing Concepts III, Inc.; Staffing Concepts IV, Inc.; Staffing Concepts V, Inc.; Staffing Concepts VI, Inc.; Staffing Concepts VII, Inc.; Staffing Concepts VIII, Inc.; Staffing Concepts IX, Inc.; Staffing Concepts Epic, Inc.; or The Hardin Group, Inc. and the respective parents, subsidiaries, predecessors, successors, and affiliates of each.

Thus, the definition of "SCI Companies" encompasses 31 different business entities; "you" or your" as the "SCI Companies as well as to all persons controlling the SCI Companies or under their control"; and the terms "Insurance Policy" or the "Policies"; or "Buyback Policies" to the extent

those definitions include Plaintiffs' definition of "SCI Companies." These definitions are overly broad and contain business entities that are not relevant to this action since the majority of the 31 business entities listed are not parties to this action. To the extent Interrogatory Nos. 2, and 4–13 use the term "SCI Companies", such Interrogatories are overly broad and unduly burdensome.

Further, Interrogatory Nos. 2, and 4 –13 are overly broad and unduly burdensome for the remaining reasons stated in SCI's objections which are restated in CNA's Motion to Compel. Thus, SCI will not restate them all again. However, as an example, Interrogatory No. 4 (a) and (b) are overly broad and unduly burdensome because it purports to require the compilation and identification of information outside of the Defendants' possession, specifically as to whether any of the "SCI Companies" (which is defined as 31 different business entities, 21 of which are non-parties) or a broker or producer providing services to the "SCI Companies" received any of the invoices on Exhibit 1. This Interrogatory is overly broad and unduly burdensome because it would require SCI to attempt to determine whether an *unidentified* broker or producer providing services to the "SCI Companies" received any of the 70 invoices on Exhibit 1, or as requested in interrogatory 4(b), whether such *unidentified* broker or producer providing services to the "SCI Companies" protested the amount owed on any of the 70 invoices on Exhibit 1. This would be extremely burdensome since SCI could not determine this information without reviewing records of 21 non-parties and unidentified brokers or producers providing services to 21 non-parties.

This Court should sustain SCI's objections that CNA's Interrogatories No. 2, and 4 –13 are overly broad and unduly burdensome and not require them to answer such Interrogatories.

**B.    SCI is not Required to Respond to Interrogatories that Bear no Relevance to any of the Claims, Defenses or Counterclaims in this Matter**

Interrogatory Nos. 2, and 4–13 request information that bears no relevance to any of the claims, defenses or counterclaims in this matter and are not reasonably calculated to lead to admissible evidence. As stated earlier, the definition of "SCI Companies" as 31 different business entities; "you" or "your" as the "SCI Companies as well as to all persons controlling the SCI Companies or under their control"; and the terms "Insurance Policy" or the "Policies"; and "Buyback Policies" to the extent those definitions include Plaintiffs' definition of "SCI Companies" contain business entities that are not relevant to this action since the majority of the 31 business entities listed are not parties to this action. To the extent Interrogatory Nos. 2, and 4–13 use the term "SCI Companies", such Interrogatories seek irrelevant information that has absolutely no bearing on claims or defenses involved in this litigation as it seeks information relating to third parties not named in this action. These requests fall outside the scope of discovery in this matter and SCI's objections should be sustained. Moreover, CNA's overly broad definition is an attempt to serve interrogatories on non-parties, which is an impermissible use of Rule 33. The scope of discovery is not without limits, *see Oppenheimer Fund v. Sanders*, 437 U.S. 342, 351 (1978) and "discovery should be tailored to the issues involved in the particular case." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 (11th Cir. 1992) (internal citations omitted). A party is only entitled to discovery relating to issues in the dispute at hand. *Tate v. United States Postal Service*, 2007 WL 521848 at *5 (S.D. Fla. Feb. 14, 2007). Interrogatory Nos. 2, and 4–13 requesting information regarding 21 non-parties are irrelevant and have no bearing on the issues in this case.

Where the relevancy of a request is not readily apparent on its face, the burden falls on the nonmoving party to establish relevancy. *See Suncast Technologies, L.L.C. v. Patrician Products,*

*Inc.*, 2008 WL 179648, at *5 (S.D. Fla. Jan. 17, 2008).  In the instant case CNA has failed to

satisfactorily explain the relevance of the information sought regarding the 21 non-parties listed in

the definition of "SCI Companies" to the litigation at issue.  *Rosenbaum v. Becker & Poliakoff,*

*P.A.*, 2010 WL 623699, *14 (S.D. Fla. Feb. 23, 2010)(court declined to compel a response to

discovery requests due to the tremendous burden of producing the requested information, coupled

with its tenuous connection to the issues in this case).

     Further, even if all the information is relevant, the burden on the Defendants to locate the

information within a trove of documents greatly outweigh its relevance.  *See Tate*, 2007 WL

521848, at *5 (S.D. Fla. Feb. 14, 2007).  The only way the information which Plaintiffs seek could

be developed is for someone to review every invoice, which alone is thousands of pages, to

determine the requested information.   As stated previously, to properly respond to the

interrogatories relating to the invoices would in all likelihood take SCI months (if SCI even had

access to the underlying claims files which CNA refuses to produce in this case).  Most of the

interrogatories propounded by CNA simply cannot be answered without a detailed analysis of

hundreds of claims which would necessitate reviewing thousands of pages of documents since each

invoice consists of over 100 pages and reflects charges for hundreds of claims.  CNA retains the

burden to demonstrate the accuracy of its charges, yet refuses to provide the information to allow

this analysis.

     This Court should sustain SCI's objections that CNA's Interrogatories No. 2, and 4 –13 are

not relevant nor reasonably calculated to lead to admissible evidence and not require them to

answer such Interrogatories.

**C.    SCI is not Required to Respond to Interrogatories that are Vague or Ambiguous**

Interrogatory Nos. 4 –13 are vague and ambiguous for the reasons stated in SCI's objections which are restated in CNA's Motion to Compel.  Thus, SCI will not restate them all again.  Generally, the interrogatories are vague and ambiguous because they purport to require information about unidentified persons and information about amounts allegedly owed without specifying the amounts or identifying specific invoices, thus forcing SCI to guess at what is meant, which is clearly not intended by Rule 33.  As an example, Interrogatory Nos. 4 (a) and (b) are vague and ambiguous because the terms "producer" and "protest" are not defined; 4(d) does not define or identify the "invoices seeking reimbursement of claim expenditures"; 4(e) does not define or identify the "invoices seeking payment of premiums; 4(f) does not define or identify "amounts owed for reconciliations, program conversions, or annual loss bills, as reflected on the invoices seeking those amounts"; 4(g) does not define or identify "invoices seeking payment of loss fund charges"; 4(h) does not define "amount in excess of the per claim deductible or plan maximum"; and 4(i) does not define "payments made".  Interrogatories must be clearly stated to allow a party to properly provide an answer.  *See Jackson v. Geometrica, Inc.* 2006 WL 213860, at *3 (M.D. Fla. Jan. 27, 2006).  This Court should sustain SCI's objections that CNA's Interrogatory Nos. 4 –13 are vague and ambiguous and not require them to answer such Interrogatories.

**IV.    CONCLUSION**

CNA's Interrogatories are unquestionably excessive, overly broad and unduly burdensome.  Further, some of the Interrogatories are also not relevant to any of the claims or defenses in this matter, and are vague and ambiguous.  It is clear that CNA's exorbitant number of interrogatories

are designed to harass and impose undue burden and expense on SCI while CNA continues to conceal from SCI and this Court the information underlying their charges in their invoices. Accordingly, this Court should deny CNA's Motion to Compel Staffing Concepts International, Inc. to Answer the June 24, 2010 Interrogatories.

Respectfully submitted,

**DATED** this 24th day of September, 2010.

/s/ Cassie L. Gisclair
Mark M. Barber
Fla. Bar No. 0573701
mbarber@broadandcassel.com
Cassie L. Gisclair
Fla. Bar No. 0135917
cgisclair@broadandcassel.com
Mercedes G. Hale
Fla. Bar No. 934630
mhale@broadandcassel.com
BROAD AND CASSEL
100 N. Tampa Street
Suite 3500
Tampa, Florida 33602
(813) 225-3020 (tel)
(813) 225-3039 (fax)
Counsel for
Defendants/Counterclaimants

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing has been filed via the CM/ECF electronic filing system on the 24th day of September, 2010, and thereby served upon counsel of record.

/s/ Cassie L. Gisclair
Attorney

20