CONTINENTAL CASUALTY
COMPANY, et al.,

        Plaintiffs/Counterdefendants,

vs.                                      **Case No. 8:09-CV-02036-T-23AEP**

STAFFING CONCEPTS, INC., et al.,

        Defendants/Counterclaimants.

_____/

## REPORT AND RECOMMENDATION

Before the Court are several outstanding motions relating to an arbitration decision issued on September 27, 2010. Defendant/counterclaimant Staffing Concepts International, Inc. has filed a Motion to Vacate Arbitration Award and Supporting Memorandum of Law (the "Motion to Vacate"), to which Counterdefendant CNA ClaimPlus, Inc. ("CNA ClaimPlus") filed its Opposition to Staffing Concept International, Inc.'s Motion to Vacate Arbitration Award (Dkt. No. 291) and Staffing Concepts International, Inc. filed a Reply in Support of its Motion to Vacate Arbitration Award and Supporting Memorandum of Law (Dkt. No. 299). CNA ClaimPlus has filed a Petition to Confirm Arbitration Award (Dkt. No. 264) to which Staffing Concepts International, Inc. has filed its Response in Opposition to Petition to Confirm Arbitration Award (Dkt. No. 277). Lastly, Plaintiffs/Counterdefendants Continental Casualty Company; American Casualty Company of Reading, Pennsylvania; Transportation Insurance Company; and National Fire Insurance Company of Hartford (collectively, "CNA") have filed a Motion for Summary

Judgment (Dkt. No. 267), to which Defendants/Counterclaimants Staffing Concepts, Inc.; Staffing Concepts National, Inc.; Staffing Concepts International, Inc.; SC of Florida II, Inc.; Venture Resources Group, LLC; Alternative Marketing Group, Inc.; Human Capital Services, Inc.; Productive Employer Concepts, Inc.; Human Capital Solutions, Inc.; and Epic Staff Management, Inc. (collectively, "SCI") have filed their Response in Opposition to, and Motion to Stay, Motion for Summary Judgment and Supporting Memorandum (Dkt. No. 278). For the reasons stated below, the Court recommends that SCI's Motion to Vacate (Dkt. No. 276) be granted in part and denied in part, CNA ClaimPlus's Petition to Confirm Arbitration Award (Dkt. No. 264) be denied without prejudice, and CNA's Motion for Summary Judgment (Dkt. No. 267) be denied without prejudice.

## I. BACKGROUND

### A.    Factual Background

SCI operates a nationwide professional employer organization ("PEO"). (Dkt. No. 1 at ¶ 19.) A PEO is a business that charges fees for assuming other companies' employment obligations, including purchasing workers' compensation insurance. (*Id*.) For policy periods from January 1, 2000 through April 30, 2003, SCI purchased workers' compensation insurance from CNA. (*Id*. at ¶¶ 7, 26.) Under its arrangement with CNA, SCI chose to be responsible for significant amounts of claim payments. To contain premium charges and other up-front costs of insurance, SCI agreed to pay high deductibles that increased from $250,000 per claim in 2000, to $350,000 in 2001, $500,000 in 2002, and $750,000 in 2003. (*Id*. at ¶¶ 27, 33, 40, 46, 52). All ten defendants in this lawsuit are named insureds on the Policies. (*Id*. at ¶¶ 28, 35, 41, 47.) In

connection with the Policies, SCI entered into Finance Agreements that, among other things, detailed the terms under which SCI was obligated to pay the premiums, deductibles, and other costs of the insurance programs. Under the Policies and Finance Agreements, CNA was required to pay for the claims, and SCI was required to reimburse CNA for the amount of each claim within the deductible. (*Id.* at ¶¶ 56(b), 60(b), 63 (b), 66(b).) The Policies and Finance Agreements do not contain arbitration provisions.

In order to facilitate claims administration, CNA and SCI agreed to use a third party administrator ("TPA"). According to SCI, the Finance Agreements provided them with the exclusive right to select a TPA. (Dkt. No. 207 at 22.) For the relevant policy periods, SCI selected CNA's subsidiary RSKCo Services, Inc., f/k/a RSKCo Claim Services, Inc. ("RSKCo") as its TPA and entered into Claim Services Agreements ("CSAs") for the years 2001, 2002, and 2003. (Dkt. No. 276 at 7.) RSKCo later assigned the CSAs to CNA ClaimPlus, another subsidiary of CNA. (Dkt. No. 209 at 1-2.) Paragraph 11 of the CSAs states that "This Agreement will be binding upon and inure to the benefit of the parties and their successors and assigns. This Agreement may not, however, be assigned by either party without the prior written consent of the other party." (Dkt. No. 276 Ex. 26 at 7.) In addition, Paragraph 9 of the CSAs contains an arbitration clause, stating that:

> In the event of any dispute relative to this Agreement which cannot be settled amicably between the parties, the parties agree to submit the dispute to arbitration as follows:
>
> a.    Three (3) arbitrators shall be selected: one (1) of whom shall be selected by Client, one (1) of whom shall be selected by RSKCo, and a third arbitrator shall be selected by the two arbitrators.

> b. The dispute shall be submitted to these three arbitrators and the decision in writing of any two of the three arbitrators shall be final and binding upon both parties to this Agreement. The arbitrators are relieved from all judicial formalities and may abstain from strict rules of law.
>
> c. Each party will pay for the costs of their arbitrator and one half of the expenses of the third arbitrator.
>
> d. All arbitration shall take place in Chicago, Illinois unless otherwise agreed upon by both parties. The procedural rules applicable to any arbitration shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

(Dkt. No. 276 Ex. 26 at 6-7.)

## B. The Present Litigation

On October 10, 2006, CNA filed the current lawsuit seeking to recover more than $13 million allegedly owed under the parties' insurance agreements. In its Amended Answer, SCI stated numerous affirmative defenses and counterclaims, including most relevantly, the prior breach of its insurance agreements by CNA in assigning its CSAs to CNA ClaimPlus, which allegedly led to deficient claims administration (hereinafter referred to generally as "claims mishandling"). (Dkt. No. 207 at 7.) During the first three years of litigation, the parties mainly argued jurisdictional issues, which ultimately brought this case to the Middle District of Florida from the Northern District of Illinois.

## C. The Arbitration Proceedings

Simultaneous with the filing of the instant lawsuit, CNA ClaimPlus filed a demand for arbitration under the CSAs with SCI[1] (the "Arbitration"). In its arbitration demand, CNA

---

[1] Staffing Concepts International, Inc. is the only respondent in the Arbitration. Staffing Concepts International, Inc. is also one of the ten affiliated entities that are the Defendants in this lawsuit, referred to collectively as SCI. However, for the purposes of this

4

ClaimPlus sought resolution of its disputes with SCI concerning $60,040 in unpaid claim handling fees, and sought declaratory judgment stating that "claims were not mishandled and that Staffing Concepts International, Inc. is entitled to no damages or other relief." (Dkt. No. 209 Ex. H.) The first three years of the Arbitration focused heavily on the arbitrability of the "claims mishandling" accusations, without focusing on the actual merits of these allegations. On September 1, 2009, the American Arbitration Association ("AAA") panel of arbitrators (the "Arbitration Panel") unanimously found that "any disputes between SCI and [CNA] ClaimPlus are to be arbitrated." (Dkt. No. 209 Ex. A.) After finding the disputes between CNA ClaimPlus and SCI arbitrable, the panel held a conference to establish procedures for resolving the arbitration demand. With due notice to both sides, the Arbitration Panel scheduled a final evidentiary hearing for November 17, 2009, and set due dates for both sides to submit pre-hearing motions or briefs, and to exchange witness and exhibit lists. (Dkt. No. 209 at 13.) CNA ClaimPlus served its papers on SCI, who did not respond. (*Id.*) In SCI's absence, the Arbitration Panel conducted the November 17, 2009 hearing as an adversary proceeding, requiring CNA ClaimPlus to introduce documents and present witnesses, whom the Arbitration Panel cross-examined. (*Id.*)

On December 13, 2009, SCI filed a Request to Reopen Hearing, which it amended and re-filed on December 16, 2009 as a Request to Continue Evidentiary Portion of Hearing. (*Id.*) After both sides filed extensive briefs and presented oral argument, the panel entered an order on May 14, 2010 allowing SCI to identify "five instances of what SCI urges are 'claims mishandling'…hopefully instances of the most egregious claims handling, [and] not merely the

_____

Report and Recommendation, in the interest of brevity and to avoid confusion, the Court will also refer to the respondent in in the Arbitration, Staffing Concepts International, Inc., as SCI.

first five cases that come to mind." (*Id.* at 15.) From August 11 to August 13, 2010, CNA ClaimPlus and SCI participated in an arbitration hearing to determine whether there had been claims mishandling by CNA ClaimPlus, based on SCI's selection of five claims files. On October 11, 2010, the parties were notified by AAA that it had received notice from the Arbitration Panel that no additional evidence was needed to come to a decision, and that the Arbitration was declared closed as of October 5, 2010. (Dkt. No. 247.)

On October 28, 2010, the Arbitration Panel issued an "Interim Award" dated September 27, 2010, finding that the five claims presented to the panel were handled with "reasonable dispatch, diligence and care," and thus, there was insufficient evidence of "claims mishandling." (Dkt. No. 276 Ex. 1 at 3.) The Arbitration Panel made it clear that it did not hold CNA ClaimPlus to a "standard of perfection." (Dkt. No. 276 Ex. 1 at 6.) They stated that "you will always have errors in claim handling, as there will be in baseball, but–in the cases of claims handling–that does not mean that the claims were 'mishandled', [sic] only that cost [sic] of mistakes should not be passed on to SCI." (Dkt. No. 276 Ex. 1 at 6.) The Arbitration Panel also found that CNA ClaimPlus was entitled to recover $60,040 in unpaid claim handling fees. (Dkt. No. 276 Ex. 1 at 9.) On May 17, 2011, the Arbitration Panel issued its Final Award, which awarded CNA ClaimPlus $2,283,014.70 in attorneys' fees. (Dkt. No. 307 Ex. 1.)

## II. DISCUSSION

### A.      SCI's Motion to Vacate (Dkt. No. 276)

In its Motion to Vacate, SCI argues that the Court should vacate the Interim Award[2] for a number of reasons. First, SCI argues that the Interim Award is not "final and appealable" under the Federal Arbitration Act ("FAA") and, therefore, cannot be confirmed. (Dkt. No. 276 at 2-3.) Second, SCI argues that the Interim Award should be vacated because Arbitrator Kenneth Gillis ("Arbitrator Gillis") was "partial" to CNA ClaimPlus. (Dkt. No. 276 at 24-29.) Third, SCI argues that the Arbitration Panel exceeded its authority under the FAA by ruling on the issue of arbitrability itself, instead of reserving that decision for the Court. (Dkt. No. 276 at 29-34.) Fourth, SCI argues that the Arbitration Panel made two improper legal rulings on the merits, namely that they disregarded the Illinois Declaratory Judgment Act and misapplied the burden of proof under Illinois law. (Dkt. No. 276 at 34-39.) Finally, SCI argues that the award should be vacated because the Arbitration Panel "refused to entertain any evidence beyond the 5 samples selected in response to [its] May 14, 2010 order, severely prejudicing SCI and depriving SCI of the requisite fundamental fairness." (Dkt. No. 276 at 39-40.)

_____

[2] As stated earlier, the Arbitration Panel issued its Final Award on May 17, 2011, which exclusively discussed attorneys' fees. Without expressly incorporating the Interim Award, the Arbitration Panel acknowledged that it had "previously rendered an Interim Award dated September 27, 2010 ...." (Dkt. No. 307 Ex. A at 1.) On June 7, 2011, CNA ClaimPlus filed a Petition to Confirm Arbitration Award (Dkt. No. 307). On August 15, 2011, SCI filed a Motion to Vacate Final Arbitration Award and Memorandum of Law in Support (Dkt. No. 309). Since the Interim Award, as opposed to the Final Award, includes substantive rulings by the Arbitration Panel on the merits of the Arbitration, SCI's Motion to Vacate is ripe. Nevertheless, while CNA ClaimPlus's Petition to Confirm Arbitration Award (Dkt. No. 307) and SCI's Motion to Vacate Final Arbitration Award and Memorandum of Law in Support (Dkt. No. 309) have not been referred to the undersigned, for the reasons stated below, the undersigned also recommends that both motions should be denied without prejudice.

## 1.    Standard Of Review

The FAA expresses a presumption that arbitration awards will be confirmed.  *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 932 (11th Cir.1990).  Moreover, the statutory grounds for vacating an award set out in the FAA are exclusive.  *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1322 -23 (11th Cir.2010).  The FAA provides for vacatur of an arbitration award in only four narrow circumstances:

> **(1)** where the award was procured by corruption, fraud, or undue means;
>
> **(2)** where there was evident partiality or corruption in the arbitrators, or either of them;
>
> **(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced; or
>
> **(4)** where the arbitrators exceeded their powers ....[3]

*See* 9 U.S.C. § 10.

## 2.    Finality

SCI first argues that, as an initial matter, the Court should defer ruling on the Motion to Vacate because the Interim Award is "not final for the purposes of Section 12 of the Federal Arbitration Act."  (Dkt. No. 276 at 3.)  Under §12 of the FAA, "[a]n arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve all claims submitted in the demand for arbitration, even though the arbitrators purport to retain jurisdiction in the event the need arises to resolve some subsidiary matter, such as damages or backpay calculations." *Fradella*

---

[3] The FAA also allows a district court to correct or modify an award under limited circumstances not relevant here.  *See* 9 U.S.C. § 11.

*v. Petricca*, 183 F.3d 17, 19 (1st Cir.1999). While an award "cannot be final if there are significant issues left to be determined," an award "does not have to be final in all respects to be a final award." *In re Rollins*, 552 F.Supp.2d 1318, 1324 (M.D. Fla. 2004) (citing *Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 720 (8th Cir.1999)). Further, courts have permitted confirmation and vacation of arbitration awards, which do not completely resolve the arbitration. *Nu-Best Franchising, Inc. v. Motion Dynamics, Inc.*, Case No. 8:05-CV-507-T-27TGW, 2006 WL 1428319 at *3 (M.D. Fla. May 17, 2006) (citing *Yasuda Fire & Marine Ins. v. Continental Cas. Co.*, 37 F.3d 345, 348 (7th Cir.1994) (finding that the district court had jurisdiction to consider a motion to vacate an interim award requiring petitioner to issue a letter of credit)); *Island Creek Coal Sales Co. v. City of Gainesville*, 729 F.2d 1046, 1049 (6th Cir.1984) (enforcing an award of specific performance, even though further arbitration was needed to completely resolve the matter).

Here, on September 27, 2010, the Arbitration Panel issued an Interim Award that adjudicated all of the claims and defenses of both parties. (Dkt. No. 276 Ex. 1.) The Arbitration Panel granted CNA ClaimPlus $60,040.00 in costs unpaid by SCI. (Dkt. No. 276 Ex. 1 at 7.) In addition, the Arbitration Panel granted CNA ClaimPlus declaratory relief that they had not mishandled claims. (Dkt. No. 276 Ex. 1 at 9.) However, the Arbitration Panel left the issue of attorneys' fees to be determined at a later date. (Dkt. No. 264 Ex. B at 9.) Nevertheless, "the issue of attorneys' fees is not so significant to make the Interim Award anything less than final." *In re Rollins*, 552 F.Supp.2d 1318, 1325 (M.D. Fla. 2004); *see also Nu-Best Franchising, Inc. v. Motion Dynamics, Inc.*, Case No. 8:05-CV-507-T-27TGW, 2006 WL 1428319 at *3-4 (M.D. Fla. May 17, 2006) (holding that an interim award was final and appealable despite the fact that attorneys' fees would be determined at a later date). Abating SCI's Motion to Vacate until the Panel

determined attorneys' fees would be inconsistent with "the primary purpose served by the arbitration process, to provide parties with expeditious dispute resolution." *Nu-Best Franchising, Inc. v. Motion Dynamics, Inc.*, Case No. 8:05-CV-507-T-27TGW, 2006 WL 1428319 at *4 (M.D. Fla. May 17, 2006) (citing *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176, 1179 (11th Cir.1981)). Nevertheless, since the Final Award was issued on May 17, 2011, the issue of finality is moot. As such, the Court recommends that the September 27, 2010 Interim Award be held to be final and appealable.

### 3. Partiality

SCI argues that the Interim Award should be vacated under 9 U.S.C. § 10(a)(2) due to Arbitrator Gillis's partiality. (Dkt. No. 276 at 25.) SCI bolsters its claim with evidence of multiple *ex parte* communications between Arbitrator Gillis and CNA ClaimPlus's counsel, including e-mails from March and April of 2009. (Dkt. No. 276 at 25.) SCI also presents an *ex parte* e-mail from June 7, 2010 between Arbitrator Gillis and CNA ClaimPlus counsel Matthew Caccamo ("Mr. Caccamo"), in which Arbitrator Gillis states that he was "so sorry that the Arbitrators [sic] decision has caused so much turmoil." (Dkt. No. 276 Ex. 24 at 2.) The next day, Mr. Caccamo forwarded the e-mail to SCI's counsel and stated that he assumed Arbitrator Gillis "meant to send the below e-mail to the entire group." (Dkt. No. 276 Ex. 24 at 2.) CNA ClaimPlus argues that the June 7, 2010 e-mail from Arbitrator Gillis regarded mere "logistical" matters and that Arbitrator Gillis intended to send the e-mail to the counsel for both parties, but "inadvertently sent to only CNA ClaimPlus' counsel." (Dkt. No. 291 at 9.) Thus, CNA ClaimPlus argues that SCI's allegations fail to meet the heavy burden for proving partiality. (Dkt. No. 291 at 9.)

On May 2, 2011, after a review of SCI's correspondence and CNA's response, the AAA issued a letter to both parties stating their decision to remove Arbitrator Gillis from the matter at issue. (Dkt. No. 302 Ex. A.) SCI argues that, in addition to the *ex parte* communications themselves, the letter demonstrates that the AAA removed Arbitrator Gillis because he was biased. (Dkt. No. 302 at 2.) CNA responds by arguing that "[a]t most, the May 2 letter suggests that the AAA removed Judge Gillis for a violation of the AAA's rule prohibiting ex parte communications." (Dkt. No. 306 at 4).

Section 10 of the FAA authorizes a court to vacate an arbitration award if there "was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). The Eleventh Circuit recognizes that "an arbitration award may be vacated due to the 'evident partiality' of an arbitrator only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Gianelli Money Purchase Plan and Trust v. ADM Investor Services, Inc.*, 46 F.3d 1309, 1312-13 (11th Cir. 1998) (citing *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir.1995); *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1202 (11th Cir.1982)). Determining if these conditions have been met "ordinarily requires a fact-intensive inquiry." *Gianelli Money Purchase Plan and Trust v. ADM Investor Services, Inc.*, 46 F.3d 1309, 1313 (11th Cir. 1998). In addition, "[t]he burden of demonstrating facts which would establish a reasonable impression of partiality is on the party challenging the award." *Austin South I, Ltd. v. Barton-Malow Co.*, 799 F.Supp. 1135, 1142 (M.D. Fla. 1992) (citing *Middlesex Mutual Insurance Co. v. Levine*, 675 F.2d 1197, 1201 (11th Cir.1982)). For an award to be vacated, the potential partiality must be "direct, definite and capable of demonstration rather than remote,

uncertain and speculative." *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1202 (11th Cir.1982).  Consequently, "the mere appearance of bias or partiality is not enough to set aside an arbitration award."[4] *Lifecare Intern., Inc. v. CD Medical, Inc.*, 68 F.3d 429, 433 (11th Cir.1995).

Here, the March 2009 *ex parte* communications involved the discussion of available dates for an arbitration hearing.  (Dkt. No. 276 Ex. 22 at 7-9.)  Arbitrator Gillis asked CNA ClaimPlus which dates for the hearing were most convenient, but neglected to ask SCI which dates were convenient for them.  (Dkt. No. 276 Ex. 22 at 7-9.)  The April 2009 *ex parte* communications involved Arbitrator Gillis contacting both parties individually to determine which party had not paid their respective arbitration fees.  (Dkt. No. 276 Ex. 22 at 4-5.)  The record shows that SCI later chose not to pay their arbitration fees (Dkt. No. 276 Ex. 22 at 3), and these communications demonstrate that Arbitrator Gillis was slightly frustrated with SCI and more congenial with CNA ClaimPlus.  Nevertheless, these *ex parte* communications at best show only the "mere appearance" of bias or partiality as opposed to direct evidence of bias.  *Lifecare Intern., Inc. v. CD Medical, Inc.*, 68 F.3d 429, 433 (11th Cir.1995).

Notwithstanding the 2009 communications, SCI relies heavily on the June 7, 2010 *ex parte* e-mail between Arbitrator Gillis and Mr. Caccamo.  SCI argues that the tone and language of the e-mail is suspicious and moved to disqualify and remove Arbitrator Gillis on July 16, 2010.  (Dkt. No. 276 Ex. 25.)  As such, the AAA requested that Arbitrator Gillis clarify the June 7, 2010 e-mail.  (Dkt. No. 276 Ex. 25 at PageID 7920.)  Arbitrator Gillis asserted that the e-mail was

---

[4] Other circuits have also decided that the appearance of bias is not enough.  *See Consol. Coal v. Local 1643, United Mine Workers*, 48 F.3d 125, 129 (4th Cir.1995); *see Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir.1992); *see Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 173 (2nd Cir.1984); *see Schmitz v. Zilveti*, 20 F.3d 1043, 1046-47 (9th Cir.1994).

supposed to be sent to all parties and "the 'turmoil' referenced in the e-mail was meant simply to refer to the fact that the arbitrators' decision created a tight timeline in which the attorneys had to prepare for a hearing." (Dkt. No. 276 Ex. 25 at PageID 7924.) Arbitrator Gillis also maintained that his offer to be available on June 15 or 16 "referred to his willingness to be present at and preside over a session intended to resolve any discovery disputes on an expedited basis." (Dkt. No. 276 Ex. 25 at PageID 7924.) After a review of the record, the Court finds that the June 7, 2010 e-mail merely addressed Arbitrator Gillis's availability to resolve the discovery disputes raised by SCI and does not demonstrate overt bias as SCI suggests. In fact, Arbitrator Gillis sent out two *ex parte* e-mails to SCI's counsel on June 7, 2010 explaining that he would be willing to hold an in-person hearing in Chicago on June 15, 2010 to hear and decide any discovery disputes. (Aff. Matthew J. Caccamo Ex. 2 (Mar. 18, 2011).) Arbitrator Gillis's *ex parte* communications on June 7, 2010 clearly involve scheduling and logistical matters with *both parties*. Further, if there was any confusion as to what the June 7, 2010 *ex parte* e-mail between Arbitrator Gillis and Mr. Caccamo entailed, that confusion was cleared up by Arbitrator Gillis per the AAA's request.

After a close examination of the record, the Court finds that there is no "direct" or "definite" evidence of partiality in Arbitrator Gillis's *ex parte* communications to CNA ClaimPlus's counsel, and as such, SCI's partiality claim is without merit. However, even if the record could establish that Arbitrator Gillis's *ex parte* communications were "direct" and "definite" evidence of partiality, this would likely still not be enough to vacate the award because the Arbitration Panel's Interim Award was the result of a unanimous decision (Dkt. No. 306 at 5). *See Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co.*, 866 F.2d 11, 14 (1st Cir. 1989) (denying a motion to vacate because "the panel decision was unanimous for plaintiff, and

defendants alleged no wrongdoing on the part of the other two members").[5]  Therefore, even if Arbitrator Gillis's vote were not counted, the award would still have the support of the majority of the Arbitration Panel.  CNA ClaimPlus correctly points out that a majority decision is all that is required by the AAA's Commercial Rule 40, which states that, "[w]hen the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions."  (Dkt No. 306 at 5.)  Thus, the Court recommends that SCI's request to vacate the Interim Award on the basis of partiality be denied.

## 4.  Determining Arbitrability

Next, SCI argues that the Court should vacate the Interim Award because the Arbitration Panel exceeded its authority in determining the arbitrability of CNA ClaimPlus's demand.  (Dkt. No. 276 at 30.)  Before issuing its Interim Award, in September of 2009, the Arbitration Panel considered and rejected SCI's argument that the CSAs were improperly assigned by RSKCo to CNA ClaimPlus and that, consequently, CNA ClaimPlus could not enforce their arbitration language against SCI.  (Dkt. No. 267 Ex. 17, at PageID 7369.)  The Arbitration Panel determined

---

[5] Other courts have similarly rejected partiality arguments where there was a unanimous decision by an arbitration panel.  *See Dailey v. Legg Mason Wood Walker, Inc.*, No. 08-1577, 2009 U.S. Dist. LEXIS 114134 at *13 (W.D. Pa. Dec. 8, 2009) ("Given that the three-member panel rendered a unanimous award against Plaintiff, any alleged bias on the part of the chairman was entirely immaterial to the result."); *see Martik Bros., Inc. v. Kiebler Slippery Rock, LLC*, No. 08-1756, 2009 U.S. Dist. Lexis 33028 at *10 (W.D. Pa. Apr. 20, 2009) ("Further, the three member panel was unanimous in its award, and Kiebler cannot establish any prejudice from any alleged bias on the part of one member of a unanimous panel"); *see Edward Mellon Trust v. Mellon*, No. 06-184, 2006 U.S. Dist. Lexis 80922 at *30-31 (W.D. Pa. Nov. 6, 2006) (finding that alleged bias of one arbitration was immaterial where all three arbitrators voted in favor of award); *see Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 628 (S.D. Tex. 2002) (finding that alleged bias of one arbitrator on a unanimous three-arbitrator panel was not prejudicial where plaintiff "has not alleged any wrongdoing by the other two members of the panel").

that the CSAs had been validly assigned and that it thus had the power to arbitrate this dispute. (*Id*.) SCI contends that this decision was not the Arbitration Panel's to make and that a court should have ruled on the validity of the assignment instead. (Dkt. No. 299 at 6-13.) And even if there was a valid assignment, SCI claims that the CSAs did not contract around the default rule that arbitrability is for a court to decide. (Dkt. No. 276 at 33-34.)

A court has the authority to decide whether parties have agreed to arbitrate disputes over arbitrability unless there is "'clea[r] and unmistakabl[e]' evidence" that the parties agreed to submit the question of arbitrability to an arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). SCI contends that CNA ClaimPlus has no such "clear and unmistakable evidence" because the only evidence CNA ClaimPlus has presented consists of the CSAs, which CNA ClaimPlus never signed and, SCI argues, were never validly assigned to CNA ClaimPlus.[6] (Dkt. No. 276 at 32.) SCI thus argues that a court should have determined whether the CSAs were validly assigned to CNA ClaimPlus–i.e., whether CNA ClaimPlus could enforce the arbitration provisions of the CSAs against SCI–before sending this dispute to arbitration. (*Id*.) Alternatively, SCI contends that even if CNA ClaimPlus had the authority to enforce the arbitration language of the CSAs against SCI, the CSAs do not clearly and unmistakably empower

---

[6] The CSAs state in relevant part that, "In the event of any dispute relative to this Agreement which cannot be settled amicably between the parties, the parties agree to submit the dispute to arbitration as follows ...." (Dkt. No. 267 Ex. 1 at PageID 7140; Dkt. No. 276 Ex. 26 at PageID 7930; Dkt. No. 267 Ex. 3 at PageID 7194.) SCI signed the 2001 CSA, but RSKCo did not. (Dkt. No. 267 Ex. 1 at PageID 7142.) Both SCI and RSKCo signed the 2002 CSA. (Dkt. No. 276 Ex. 26 at PageID 7932.) Neither SCI nor RSKCo signed the 2003 CSA. (Dkt. No. 267 Ex. 3 at PageID 7196.) It is unclear from the record which CSA(s) the Arbitration Panel examined. In any event, CNA ClaimPlus, RSKCo's successor in interest, never signed any of the CSAs.

the arbitrators to entertain questions of arbitrability since they only incorporated the "procedural" rules of the AAA and thus did not incorporate AAA Rule 7(a).[7]   (Dkt. No. 276 at 33.)

CNA ClaimPlus argues that SCI cannot prevail on its first argument because questions about the general validity of a contract containing a broad arbitration agreement are for arbitrators to decide as opposed to a court.  (Dkt. No. 291 at 16); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *Chastain v. Robinson Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992). In *Prima Paint Corp. v. Flood & Conklin Mfg.*, the Supreme Court held that under the FAA, a claim of fraud in the inducement of a contract that contains a broad arbitration agreement is a matter for the arbitrator to decide.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967).  However, claims of fraud in the inducement of an arbitration clause in particular should be decided by a court.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).  The Supreme Court subsequently derived from *Prima Paint* the principle that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006).  CNA ClaimPlus construes SCI's argument that RSKCo never validly assigned the CSAs to CNA ClaimPlus as a challenge to the general validity of those contracts and, under *Prima Paint* and its progeny, presented an issue for arbitration, not judicial resolution. (Dkt. No. 291 at 17.)

---

[7] AAA Rule 7(a) provides that, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  AM. ARBITRATION ASS'N, Commercial Arbitration Rules, http://www.adr.org/sp.asp?id=22440#R7.

SCI counters by noting that in *Chastain v. Robinson Humphrey Co., Inc.,* the Eleventh Circuit declined to paint *Prima Paint* with such a broad brush by distinguishing between questions about the general validity of a contract containing an arbitration agreement and questions about the very existence of such a contract. (Dkt. No. 299 at 6); *Chastain v. Robinson Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992). SCI argues that its challenge to the assignment of the CSAs amounts to a denial of the very existence of any contract between itself and CNA ClaimPlus and, under *Chastain*, presents an issue the Arbitration Panel did not have the authority to entertain. (Dkt. No. 299 at 8-9.) In *Chastain*, the Eleventh Circuit reviewed a district court's denial of a motion to compel arbitration where the party seeking to avoid arbitration had never signed any contract containing an arbitration agreement and argued that she had never authorized anyone to sign such a contract on her behalf. *Chastain*, 957 F.2d at 853. In upholding the denial, the court noted that:

> Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general .... The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of any agreement, including the existence of an agreement to arbitrate .... Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language.

*Chastain*, 957 F.2d at 854 (citations omitted, emphases in original). The Supreme Court has recognized *Chastain*'s distinction between challenges to the "validity" and the "existence" of a contract containing arbitration language. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any

17

agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in [*Chastain*] ....").

To put the existence of an agreement to arbitrate at issue, the party seeking to avoid arbitration must make an "unequivocal denial" that the agreement has been made and produce "some evidence ... to substantiate the denial." *Chastain*, 957 F.2d at 854. Further, the evidence must be enough to make the denial "colorable." *Chastain*, 957 F.2d at 855. SCI argues that it has met this test with regards to any alleged agreement with CNA ClaimPlus. (Dkt. No. 299 at 8.) SCI contends that because CNA ClaimPlus never signed the CSAs and because SCI has argued the CSAs were never validly assigned to CNA ClaimPlus, SCI has raised an "existence" question that, under *Chastain*, merits judicial resolution. (Dkt. No. 299 at 8-9.) The Eleventh Circuit has signaled that under *Chastain*, courts should decide whether a contract has been validly assigned before sending a dispute to arbitration, *see Wheat, First Securities, Inc. v. Green*, 993 F.2d 814 (11th Cir. 1993), and today this Court chooses to heed that signal.

In *Wheat First*, the Eleventh Circuit held that it was for a court, and not an arbitrator, to determine whether arbitration agreements could be enforced against a successor in interest to the original party to the contracts. *Wheat First*, 993 F.2d at 819. In that case, Green, the party seeking to compel arbitration against Wheat First, had entered into contracts with Wheat First's predecessor, Marshall Securities. *Wheat First*, 993 F.2d at 815-16. These contracts contained arbitration clauses. *Wheat First*, 993 F.2d at 816-17. But when Wheat First purchased assets from Marshall Securities, the purchase agreement included an express provision denying the assumption of Marshall Securities' liabilities except for certain contracts specified in the agreement. *Wheat First*, 993 F.2d at 816. Wheat First argued that since the contracts between Green and Marshall

Securities were not among those enumerated in the purchase agreement, Green lacked the power to force Wheat First into arbitration. *Wheat First*, 993 F.2d at 816-17. The Eleventh Circuit held that Wheat First had presented a *Chastain* existence question that merited judicial resolution. *Wheat First*, 993 F.2d at 819. In support of its holding, the court cited *I.S. Joseph Co. v. Michigan Sugar Co.*, where the Eighth Circuit held that:

> Absent some indication in the original agreement that the parties at the time provided for assignment of their interests under the agreement or otherwise intended to bind themselves to entities not then in existence, the validity of [an] assignment ... is [an issue] which is reserved for the court under the [Federal Arbitration] Act.

*Wheat First*, 993 F.2d at 819 (quoting *I.S. Joseph Co. v. Michigan Sugar Co.*, 803 F.2d 396, 400 (8th Cir. 1986)). After *Wheat First*, the Eleventh Circuit continued to cite with approval *I.S. Joseph*'s conclusion "that [a] court, rather than [an] arbitrator, should decide whether [an] assignee of [an] original party could enforce [an] arbitration clause." *Bess v. Check Express*, 294 F.3d 1298, 1306 (11th Cir. 2002). In addition, the Eleventh Circuit has interpreted *Chastain* to mean that "a district court, rather than a panel of arbitrators, must decide whether a challenged agreement to arbitrate is enforceable against the parties in question." *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008). Other circuits have expressly approved of *I.S. Joseph*'s holding as well. *See, e.g., Large v. Conseco Finance Service Corp.*, 292 F.3d 49, 54 (1st Cir. 2002) (citing with approval *I.S. Joseph*'s decision to "direct[] district court rather than arbitrator to decide whether purported assignee could enforce an arbitration clause in a contract to which it was not an original party"); *see Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989) (recognizing *I.S. Joseph*'s holding but reaching a different result because of a factual distinction); *see Sandavik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107 n.5 (3d Cir.

2000) (citing with approval *I.S. Joseph*'s holding that "the enforceability of an arbitration clause is a question for the court when one party denies the existence of a contract with the other"); *see Will-Drill Resources, Inc. v. Samson*, 352 F.3d 211, 216 (5th Cir. 2003) (citing with approval *I.S. Joseph*'s "holding that question of whether the assignee of party to an agreement including arbitration clause could compel arbitration was for the courts"); *see Burden v. Check Into Cash of Ky. LLC*, 267 F.3d 483, 490 (6th Cir. 2001) (citing with approval *I.S. Joseph*'s holding that courts should "determin[e] whether assignee of signatory had power to enforce arbitration agreement"); *see In re Medical Engineering Corp.*, 976 F.2d 746, at *4 n.4 (Fed. Cir. 1992) (noting and distinguishing *I.S. Joseph*'s holding that courts should determine the "issue of whether assignee of party to arbitration agreement acquired right to require arbitration").

Here, SCI presents arguments analogous to those made by the party seeking to avoid arbitration in *Wheat First*. Wheat First argued that since its purchase agreement with Marshall Securities contained an express denial of successor liability except for certain enumerated contracts, a court, and not the arbitrator, should in the first instance decide whether it agreed to arbitration. SCI similarly argues that the CSAs, which contained an express prohibition on assignment except in an enumerated circumstance (i.e., upon mutual consent), were never validly assigned to CNA ClaimPlus by its predecessor, and thus a court should in the first instance decide whether it agreed to arbitrate this dispute. In addition, SCI's reasoning mirrors the Eighth Circuit's reasoning in *I.S. Joseph*, the case on which the Eleventh Circuit expressly supported its decision in *Wheat First*. *See I.S. Joseph Co. v. Michigan Sugar Co.*, 803 F.2d 396, 399 (8th Cir. 1986) ("Nevertheless, any power that the arbitrator has to resolve the dispute must find its source in a real agreement between the parties. ... If there is in fact a dispute as to whether an agreement

to arbitrate exists, then that issue must first be determined by the court as a prerequisite to the arbitrator's taking jurisdiction."). Given the Eleventh Circuit's reliance on *I.S. Joseph*'s holding that the validity of an assignment is for a court to decide, it is not the task of this Court to parse *Wheat First* and strain to reach a result directly contrary to the one that *I.S. Joseph* commands (and that the Eleventh Circuit has repeatedly endorsed). Thus, based on the Eleventh Circuit's analyses in *Wheat First* and *Bess*, the Court finds that SCI has put the "existence" of an agreement to arbitrate at issue. SCI has unequivocally denied that the CSAs have been properly assigned to CNA ClaimPlus, and it has made that denial "colorable" by demonstrating that the CSAs were not signed by CNA ClaimPlus and contained an express prohibition on assignment except upon mutual consent of the parties. Thus, the Arbitration Panel exceeded its authority when it ruled on the validity of RSKCo's alleged assignment of the CSAs to CNA ClaimPlus and determined the arbitrability issue.

Since this Court has concluded that the Arbitration Panel exceeded its powers on the basis of SCI's first argument, there is no need at this juncture to consider SCI's alternative claim that AAA Rule 7(a) is a substantive, rather than procedural, rule and thus was not incorporated into the CSAs by their reference to "procedural" AAA rules. CNA ClaimPlus is correct in its assertion that, assuming the existence of an agreement, if the CSAs incorporated AAA Rule 7(a), the panel would have the authority to determine arbitrability. However, because the Court has found that the arbitrability issue is for the Court to decided, the Court need not address whether the CSAs incorporated AAA Rule 7(a).

In sum, SCI's contention that CNA ClaimPlus lacked the authority to enforce the CSAs against SCI presented an issue for a court in the first instance. The Arbitration Panel exceeded its

powers in determining the enforceability of the CSAs against SCI, and a court should have determined whether the CSAs were validly assigned to CNA ClaimPlus before sending this dispute to arbitration. The Arbitration Panel's holding that the assignment was valid and that this dispute was arbitrable should be set aside because this issue must be decided independently by the Court. Therefore, the Court recommends that, as to SCI's arbitrability argument, SCI's Motion to Vacate be granted. In addition, the Court recommends setting a status conference before the undersigned or the District Court to create a scheduling order so that the arbitrability issue may proceed accordingly. *See Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008) ("Once an agreement to arbitrate is thus put 'in issue,' the Federal Arbitration Act (FAA) requires the district court to 'proceed summarily to the trial thereof' and if the objecting party has not requested a jury trial, 'the court shall hear and determine such issue.'"). Lastly, in the event that the Court upholds the assignment and determines that this matter was properly before the Arbitration Panel, the Court recommends that the Interim Award should stand, subject, of course, to whatever appellate remedies might be available. *See I.S. Joseph*, 803 F.2d at 400-01 ("[I]f the District Court upholds the assignment, it will not be necessary to repeat the arbitration process. The arbitrators' award would stand, subject, of course, to whatever appellate remedies might be available, either for review by this Court of the District Court's legal holding in favor of assignment, or for review of the arbitrators' award in an appropriate forum.").

**5.      Challenges to the Arbitration Panel's Legal Rulings**

SCI next argues that the Arbitration Panel made two improper legal rulings on the merits, namely that the Arbitration Panel's declaratory judgment in favor of CNA ClaimPlus was inconsistent with the Illinois Declaratory Judgment Act and that the Arbitration Panel misapplied the burden of proof.  (Dkt. No. 276 at 34-39.)

**a.      Illinois Declaratory Judgment Act**

SCI contends that, while CNA ClaimPlus sought a declaration that "claims were not mishandled" by the Arbitration Panel, Illinois law prohibits a plaintiff from seeking declaratory relief on claims of nonliability for past acts.[8] (Dkt. No. 176 at 34.)  In support of its argument, SCI cites to *Eyman v. McDonough District Hospital*, in which the Illinois Appellate Court explained the limits of declaratory judgment procedure in the state of Illinois:

> The central purpose of the declaratory judgment procedure is to allow the court to address a controversy one step sooner than normal after a dispute has arisen, but before steps are taken which would give rise to a claim for damages or other relief.  The declaratory judgment procedure allows parties to a dispute to learn the consequences of their action before acting.  A declaration of nonliability for past conduct is not a function of the declaratory judgment statute.

*See Eyman v. McDonough District Hospital*, 613 N.E.2d 819, 821 (Ill. App. 1993) (citations omitted).  Thus, SCI argues, "the claim is improper and seeks relief that is unavailable under Illinois law."  (Dkt. No. 276 at 36.)  While SCI is correct in its analysis of Illinois declaratory judgment law, SCI fails to address why the Arbitration Panel would be compelled to incorporate procedural limitations founded in Illinois state law.  CNA ClaimPlus contends that the "arbitration

---

[8] Section III, Paragraph 21 of the CSAs states that "This Agreement will be construed and governed by the laws of the State of Illinois."  (Dkt. No. 267 Ex. 1 at PageID 7141.)

provision in the [CSAs] sets no limit on the panel's power to award any type of remedy. If anything, the [CSAs] reinforce the panel's broad power to issue declaratory relief or any other remedy ...." (Dkt. No. 291 at 32-33.) Namely, the CSAs' arbitration clause states that "[t]he arbitrators are relieved from all judicial formalities and may abstain from strict rules of law." (Dkt. No. 267 Ex. 1 at PageID 7140.) In spite of this provision, SCI argues that "fundamental (and uniform) precepts of declaratory judgment law are not mere procedural devices or judicial formalities for which the alleged arbitration agreement authorized waiver." However, SCI cites to no law that supports its conclusion that the Arbitration Panel's power is limited by Illinois declaratory judgment law. To the contrary, CNA ClaimPlus correctly asserts that "the Illinois Declaratory Judgment Act did not apply to [the] arbitration, and it certainly did not act to limit the arbitrators' remedial powers."

In *Mastrobuono v. Shearson Lehman Hutton, Inc.*, the Supreme Court held that, in accordance with the FAA's pro-arbitration policy, a choice-of-law provision by itself did not act to preclude the arbitration panel's broad remedial power. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995). In that case, respondent Shearson Lehman Hutton, Inc. argued that the arbitration panel exceeded its authority when it issued an award in favor of petitioner Antonio Mastrobuono ("Mr. Mastrobuono") to include $400,000 in punitive damages. *Id*. at 53. The contract under which the dispute arose included a choice-of-law provision, which specified that the contract would be governed by New York law. *Id*. at 54. Since, in New York, the power to award punitive damages is limited to judicial tribunals and may not be exercised by arbitrators, the district court and court of appeals held that the panel of arbitrators had no power to award punitive damages in that case. *Id*. The Supreme Court reversed, however, finding that the

arbitration panel's remedial authority was not limited by New York law. Instead, the "choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship." *Id*. at 59. The Court looked instead to the language of the arbitration clause in defining the powers of the arbitrators. Namely, the arbitration clause stated that "any controversy arising out of or relating to [the contract], shall be settled by arbitration in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. ...." *Id*. The National Association of Securities Dealers, Inc. (the "NASD") rules indicated that the arbitrators may award "damages and other relief," which the Court interpreted as "broad enough to at least contemplate such a remedy." *Id*. at 61. Thus, the Court held that:

> We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read "the laws of the State of New York" to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.

*Id*. at 63-4.

In this case, while the CSAs include an Illinois choice-of-law provision, the arbitration clause states that the "procedural rules applicable to any arbitration shall be in accordance with the Commercial Arbitration Rules of the [AAA]." (Dkt. No. 267 Ex. 1 at PageID 7140.) AAA Rule 43(a) provides that, "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." AM. ARBITRATION ASS'N, Commercial Arbitration Rules, http://www.adr.org/sp.asp?id=22440#R43. Just as the *Mastrobuono* Court looked to the NASD procedural rules to determine the arbitrators' remedial authority, here, the AAA

Commercial Arbitration Rules provide the Arbitration Panel with broad remedial authority, which includes issuing a declaratory judgment. *See Mastrobuono*, 514 U.S. at 61 (finding that the NASD rules allowed for the issuance of punitive damages where the applicable procedural rule appeared "broad enough at least to contemplate such a remedy"). Without contractual language that would support the incorporation of state procedural limitations into the Arbitration, there simply is no legal basis for SCI's argument that the Arbitration Panel exceeded its authority by issuing a declaratory judgment.

### b.    Burden of Proof

SCI also argues that the Arbitration Panel exceeded its powers under the FAA by "shifting the burden of proof from CNA [ClaimPlus] to SCI on both of [CNA ClaimPlus's] arbitration claims." (Dkt. No. 276 at 38.) Specifically, SCI alleges that for both of CNA ClaimPlus's claims, CNA ClaimPlus "was required under Illinois law to prove its proper handling of the workers compensation claims at issue." (Dkt. No. 276 at 38.) Instead, SCI contends, the Arbitration Panel "essentially shifted [CNA ClaimPlus's] entire burden to SCI, finding SCI failed to demonstrate any of the 4,376 workers compensation claims were mishandled." (Dkt. No. 276 at 38.)

As stated earlier, the FAA presumes that arbitration awards should be confirmed, and provides only a few narrowly-confined circumstances under which an award may vacated. *See* 9 U.S.C. § 10. In this case, SCI's argument that the Arbitration Panel exceeded its powers requires a showing that the Arbitration Panel "fail[ed] to comply with mutually agreed-upon contractual provisions in [the] agreement to arbitrate." *See Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011). The CSAs' arbitration clause explicitly states that "[t]he arbitrators are

*relieved from all judicial formalities and may abstain from strict rules of law*." (Dkt. No. 267 Ex. 1 at PageID 7140 (emphasis added).) Thus, SCI incorrectly argues that CNA ClaimPlus "was required under Illinois law to prove its proper handling of the workers compensation claims at issue." (Dkt. No. 276 at 38.) Accepting SCI's position would essentially require the Court to undertake a *de novo* review of the substantive law invoked and applied in the Arbitration. *See Saturn Telecommunications Services, Inc. v. Covad Communications Co.*, 560 F.Supp.2d 1278, 1287 (S.D. Fla. 2008) ("I do not agree with [the defendant's] apparent position that whenever an arbitrator misapplies the applicable state law to the facts of a case (and invalidates a provision of the parties' agreement based on that misapplication of law) then he necessarily acts in excess of his authority."). As CNA ClaimPlus correctly asserts, "SCI makes no reference to anything in the [CSAs] that would limit the panel's authority to apply the burdens as it sees fit." (Dkt. No. 291 at 31); *see Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011) ("[A]rbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party.") (citations and quotations omitted). Whether or not the Arbitration Panel applied the proper burden of proof under Illinois law is immaterial to the Court's inquiry. *See Frazier v. CitiFinancial Corp,* LLC, 604 F.3d 1313, 1323-24 (11th Cir. 2010) (holding that judicially-created bases for vacatur, such as the traditional "manifest disregard of the law" basis, are no longer valid); *see also Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S.Ct. 1758, 1767 (2010) (citations omitted). Simply stated, the Court does not have the jurisdiction to vacate the Interim Award on the basis that the Arbitration Panel exceeded its powers by misapplying Illinois substantive law. *See Southern Communications Services, Inc. v. Thomas*, Case No. 1:10-CV-2975-AT, 2011 WL 5386428 at *12 (N.D. Ga. Nov. 3, 2011) (finding that the plaintiff's

misapplication of the law argument must "fail because an arbitrator's incorrect legal conclusion is not grounds for vacating or modifying the award.") (citations and quotations omitted); *see White Springs Agricultural Chemicals, Inc. v. Glawson Investments Corp.*, 660 F.3d 1277, 1280 (11th Cir. 2011) ("Even though [the plaintiff] presents its argument in terms of the FAA, it asks us to do what we may not–look to the legal merits of the underlying award."). Thus, SCI's burden of proof argument does not clear the "high hurdle" set for vacating arbitration awards. *See See Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S.Ct. 1758, 1767 (2010) (*"*Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error-or even a serious error.") (citations omitted).

Therefore, the Court recommends that, as to SCI's challenges to the Arbitration Panel's legal rulings, SCI's Motion to Vacate be denied.

### 6.    Refusal to Hear Certain Evidence

Lastly, SCI argues that the Interim Award should be vacated under the FAA since the Arbitration Panel refused to hear pertinent and material evidence. (Dkt. No. 276 at 39-40.) According to SCI, the Arbitration Panel was "guilty of misconduct" by reaching a decision based on a sample of only five workers' compensation claims out of the 4,376 claims at issue." (Dkt. No. 276 at 40.) SCI contends that they were unable to choose these workers' compensation claims and as a result, the claims were unrepresentative of the entire population of claims underlying CNA ClaimPlus's arbitration demands. (Dkt. No. 276 at 40.) Since the Arbitration Panel refused to entertain any evidence beyond the five sample claims, SCI argues that it was severely prejudiced and deprived of fundamental fairness. (Dkt. No. 276 at 40.)

Arbitrators "enjoy wide latitude in conducting an arbitration hearing," and they "are not constrained by formal rules of procedure or evidence." *Robbins v. Day*, 954 F.2d 679, 685 (11th Cir.1992), *overruled on other grounds*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 948 (1995). A federal court may vacate an arbitrator's award under 9 U.S.C. § 10(a)(3) only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties and denies them a fair hearing. *Id*. However, an arbitration award must not be set aside for the arbitrator's refusal to hear evidence that is cumulative or irrelevant. *Id*. After all, the basic policy behind arbitration is to permit parties to resolve their disputes in an expeditious manner without all the formalities and procedures that might attend full-fledged litigation. *Scott v. Prudential Securities, Inc.*, 141 F.3d 1007, 1016 (11th Cir. 1998) (citing *Schmidt v. Finberg*, 942 F.2d 1571, 1573 (11th Cir.1991)).

In the Arbitration, the Arbitration Panel ruled that SCI had the burden of proving "claims mishandling" by CNA ClaimPlus. (Dkt. No. 264 Ex. B at 2.) The Arbitration Panel looked to the CSAs, which required the TPA to handle workers' compensation claims with "reasonable dispatch, diligence and care," in ascertaining whether CNA ClaimPlus was liable for "claims mishandling." (Dkt. No. 264 Ex. B at 2.) In making their determination, the Arbitration Panel directed SCI to bring forth five claims that SCI felt were the "most 'egregious' examples of claims mishandling."[9] (Dkt. No. 264 Ex. B at 2-3.) Based on the Arbitration Panel's review of these

---

[9] The Court notes that in light of SCI's initial refusal to participate in the Arbitration, the Arbitration Panel was under no obligation to reopen the proceeding and allow any discovery on the merits. Nevertheless, as stated below, the Court finds that once the Arbitration Panel decided to reopen the Arbitration and allow SCI to participate, the Arbitration Panel did not engage in misconduct by directing SCI to bring forth only five claims of alleged "claims mishandling."

claims in conjunction with opposing expert testimony, the Arbitration Panel concluded that there was not "claims mishandling" in the five claims chosen by SCI. The Arbitration Panel went on to conclude that, "if these five hand-picked examples of the most egregious claims mishandling do not, in fact, amount to claims mishandling, then neither does any of the other remaining claims." (Dkt. No. 264 Ex. B at 9-10.) Thus, the Arbitration Panel granted CNA ClaimPlus's request for declaratory judgment that the claims "were handled with 'reasonable dispatch, diligence and care.'" (Dkt. No. 264 Ex. B at 9.) The Arbitration Panel, however, did not intend their declaratory judgment to mean that *no errors* were committed by CNA ClaimPlus in the course of handling the five claims reviewed or, most likely, the other 4,371 claims not presented to the Arbitration Panel. (Dkt. No. 264 Ex. B at 6.) The Arbitration Panel reasoned that "you will always have errors in claim handling, as there will be in baseball, but – in the case of claims handling – that does not mean that the claims were 'mishandled,' only that cost of mistakes should not be passed on to SCI." (Dkt. No. 264 Ex. B at 6.) Indeed, the Arbitration Panel noted both duplicate payments and overpayments in the five claims presented to them. (Dkt. No. 264 Ex. B at 6-7.) However, despite the presence of mistakes, the Arbitration Panel reiterated that "perfection" was not the standard under which it reviewed the five claims chosen by SCI for review. (Dkt. No. 264 Ex. B at 6.)

Had the Arbitration Panel been given the task to determine whether *any errors* were committed by CNA ClaimPlus in the course of handling SCI's workers' compensation claims, perhaps SCI's argument that the Arbitration Panel should have considered all 4,376 claims would be more persuasive. However, the Arbitration Panel explicitly stated that it did not find that *no errors* were made. Instead, the Arbitration Panel concluded that there was no "claims

mishandling" on the basis that the claims were handled with "reasonable dispatch, diligence and care." (Dkt. No. 264 Ex. B at 9.)  In reaching its conclusion, the Arbitration Panel enjoyed a wide range of discretion in deciding what evidence was material and/or pertinent to its determination. The Court finds that the Arbitration Panel's decision to request five examples of the most egregious claims to determine whether there was "claims mishandling" across the 4,376 claims at issue was within the Arbitration Panel's discretion.  *See Rosenweig v. Morgan Stanley & Co., Inc.*, 494 F.3d 1328, 1333-34 (11th Cir. 2007) (finding that the "the arbitrators committed no misconduct because they had several reasonable bases for limiting evidence ... none of which prejudiced [the defendant].").  The Arbitration Panel decided that it was SCI's burden to prove "claims mishandling," and that SCI had not met its burden in submitting the five claims for review.  The remaining 4,371 claims would thus constitute cumulative, unnecessary evidence that the Arbitration Panel was not required to review.  Having provided SCI with an opportunity to present material and pertinent evidence in support of its argument, the Court is not required to second-guess the Arbitration Panel's methods and reasoning where it was contractually "relieved from all judicial formalities and may abstain from strict rules of law."  (Dkt. No. 267 Ex. 1 at PageID 7140.)  As such, SCI's argument that the Interim Award should be vacated since the Arbitration Panel refused to hear certain evidence is improper.  Thus, the Court recommends that SCI's request to vacate the Interim Award on the basis that the Arbitration Panel was guilty of misconduct by refusing to hear pertinent and material evidence be denied.

**B.    CNA's Petition to Confirm Arbitration Award (Dkt. No. 264) and Motion for Summary Judgment (Dkt. No. 267)**

Since the Court recommends that the Motion to Vacate (Dkt. No. 276) be granted as to the arbitrability issue, the Court is unable to properly address CNA's Petition to Confirm Arbitration Award (Dkt. No. 264) and CNA's Motion for Summary Judgment (Dkt. No. 267) at this time.  As such, the Court recommends that CNA's Petition to Confirm Arbitration Award (Dkt. No. 264) and CNA's Motion for Summary Judgment (Dkt No. 267) be denied without prejudice since these motions cannot be resolved until the Court decides the arbitrability issue.

### III.  CONCLUSION

On SCI's Motion to Vacate (Dkt. No. 276), the Court finds that, with the exception of SCI's arbitrability argument, SCI does not present any bases under which the Court is required to vacate the Interim Award.  Nevertheless, having found that the Arbitration Panel exceeded its powers in deciding arbitrability, the issue of whether the CSAs were properly assigned to CNA ClaimPlus and as a result whether arbitration was appropriate is now ripe for the Court's consideration.  Further, as the arbitrability issue remains outstanding, CNA's Petition to Confirm Arbitration Award (Dkt. No. 264) and Motion for Summary Judgment (Dkt. No. 267) are premature.  Accordingly, and after due consideration, the Court **RECOMMENDS** that:

1)    SCI's Motion to Vacate (Dkt. No. 276) be **GRANTED IN PART AND DENIED IN PART**;

2)    CNA's Petition to Confirm Arbitration Award (Dkt. No. 264) be **DENIED WITHOUT PREJUDICE**;

32

3)      CNA's Motion for Summary Judgment (Dkt. No. 267) be **DENIED WITHOUT PREJUDICE**; and

4)      A status conference be set before the undersigned or the District Court to create a scheduling order so that the arbitrability issue may proceed accordingly.

**IT IS SO REPORTED** at Tampa, Florida this 20th day of December, 2011.


_____

ANTHONY E. PORCELLI
United States Magistrate Judge


**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) (*en banc*).


Copies furnished to:

Honorable Steven D. Merryday

Counsel of Record